# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Larry P. Rayfield, | ) | C/A No. 4:09-0061-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the magistrate judge's report and recommendation that this court affirm the decision of the Commissioner denying plaintiff's application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-83c. The record includes a report and recommendation of the United States magistrate judge made in accordance with 28 U.S.C. § 636(b)(1)(B). Plaintiff has filed written objections to the report and recommendation. For the reasons set forth below, the court adopts the report and recommendation of the magistrate judge and affirms the Commissioner's decision denying plaintiff's application for DIB and SSI.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed for DIB and SSI on July 20, 2004 (Tr. 55-63), alleging disability as a result of leg problems, heart problems, high blood pressure, diabetes, chronic

1

obstructive pulmonary disease (COPD), bad nerves, depression, and double-vision (Tr. 41, 47, 102, 116, 126, 130, 162). Plaintiff identified March 1, 2004, as the disability onset date. Tr. 60. The Social Security Administration denied plaintiff's application on January 14, 2005 (Tr. 44-47), and on reconsideration (Tr. 39-43). Plaintiff requested an administrative hearing, which was held on March 10, 2008. Tr. 14. The administrative law judge (ALJ) issued her decision on September 2, 2008, finding plaintiff not disabled because he could perform his past relevant work as it is generally performed in the national economy. Tr. 11-26. Specifically, the ALJ found:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since March 1, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: mild axonal neuropathy, diabetes mellitus, and possible anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). He is able to lift/carry up to 50 pounds occasionally and 25 pounds frequently. He is able to stand/walk for at least a total of 6 hours per workday. He is able to sit for at least a total of 6 hours per workday. He is unable to climb ladders, ropes or scaffolds. He is able to occasionally climb ramps and stairs. He should avoid concentrated exposure to hazards. He is able to perform simple tasks that do not require ongoing interaction with the general public. He is able to understand and remember short and simple instructions. He is able to attend to

and perform simple tasks without special supervision for at least two-hour periods.  He is able to respond appropriately to changes in a routine setting.  He is able to avoid work hazards.

6.   The claimant is capable of performing past relevant work as rest area cleaner (unskilled; medium exertion).  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 16-26.

On November 28, 2008, the Appeals Council denied plaintiff's request for review and rendered the Commissioner's decision final.  Tr. 6-10.  Plaintiff then filed this action for judicial review, raising the following assertions of error:

1.   DID THE ADMINISTRATIVE LAW JUDGE COMMIT REVERSIBLE ERROR BY FAILING TO ACCORD "GREAT WEIGHT" TO THE OPINIONS OF MR. RAYFIELD'S TREATING PHYSICIANS, DOCTORS KLOSTERMAN AND BROWNING, THAT MR. RAYFIELD WAS TOTALLY DISABLED?  YES.

2.   DID THE ADMINISTRATIVE LAW JUDGE COMMIT REVERSIBLE ERROR BECAUSE A CRITICAL FINDING BY THE ADMINISTRATIVE LAW JUDGE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE?  YES.

Pl.'s Br. 1.  The magistrate judge rejected plaintiff's arguments and recommended that the Commissioner's decision denying plaintiff DIB and SSI benefits be affirmed. Plaintiff filed specific objections to the magistrate judge's findings and conclusions regarding both of the issues above, which this court will review de novo.

### B. Plaintiff's History

Plaintiff was born on July 21, 1952. Tr. 55. Plaintiff testified that he dropped out of school after the seventh grade, and he is unable to read or write, except for spelling his name. Tr. 565. From December 2002 to July 2004, plaintiff worked as a custodian for Hawthorne Services, in Gaffney, South Carolina, mopping, cleaning rest rooms, taking out trash, and keeping a parking lot clean. Tr. 65, 78, 85. The record reflects that plaintiff stopped working for this employer in July 2004 as a result of his medical condition. Tr. 65. Plaintiff's prior work history includes employment as a custodian, laborer, pipe insulator, and weaver. Tr. 26, 64-71, 76-91, 144-58.

On February 13, 2004, plaintiff presented at the Upstate Carolina Medical Center (UCMC), complaining of a headache and chest and joint pain. Tr. 167. The attending physician, Dr. David Gammon, found a past history of hypertension and arthritis (Tr. 168); however, cardiac enzyme test results were negative for occurrence of a heart attack (Tr. 167), and a chest x-ray showed some "chronic changes affecting the lungs but no evidence for acute pulmonary process" (Tr. 171). Dr. Gammon diagnosed plaintiff with an upper respiratory infection and a low serum potassium level. Tr. 167.

On July 12, 2004, plaintiff presented to the UCMC emergency room, complaining of chest pain radiating into his left arm, diaphoresis, dizziness, shortness of breath, and he apparently had a syncopal episode, which he did not remember. Tr. 175. At this time, Dr. Gammon noted that plaintiff had a history of "hard to control" hypertension, an angioplasty several years earlier, COPD, peripheral vascular disease, and anxiety depression. Tr. 175. Plaintiff underwent multiple tests. Serial cardiac enzymes, an

echocardiogram, stress test, and EKG, along with several days of monitoring telemetry all produced normal results. Tr. 173. Tests showed "no evidence of inducible ischemia, or significant fixed perfusion deficit." Tr. 179. Plaintiff complained of anxiety, and he wanted Xanax to treat this condition. Dr. Gammon referred plaintiff for a mental health evaluation, and plaintiff did not meet the criteria for in-patient hospitalization, so the mental health unit agreed to see him on an outpatient basis. Tr. 173. Plaintiff's blood pressure was high, and Dr. Gammon made appropriate adjustments to plaintiff's medications. Tr. 173. Dr. Gammon prescribed Xanax, Remeron, Ultracet, and Clinoril upon plaintiff's discharge. Tr. 173.

Plaintiff underwent a satisfactory pulmonary function test on November 1, 2004. Tr. 181-84. A chest x-ray dated November 6, 2004, showed "no acute cardiopulmonary abnormality." Tr. 195. Plaintiff's heart was not enlarged and the lungs appeared clear. Tr. 195.

On December 17, 2004, plaintiff presented to Dr. Jose Eusebio, at the Sanger Clinic, in Shelby, North Carolina. Plaintiff complained of chest pain radiating to the left shoulder. Tr. 185. He stated that the symptoms would last for several minutes, and he would take one or two nitroglycerin tablets to relieve the pain. Tr. 185. Plaintiff stated that walking approximately one quarter mile would cause him to have shortness of breath, and he experienced numbness in his left arm. Tr. 185. Dr. Eusebio's assessment noted plaintiff's chest pain, hypertension, dsylipidemia, diabetes, a history of tobacco use, and a family history of coronary artery disease. Tr. 187. Dr. Eusebio performed an outpatient left heart catheterization, coronary angiography, and biplane left ventriculography and

application of an Angio-Seal on December 20, 2004.  Tr. 187.  Dr. Eusebio found no significant coronary artery disease and noted that plaintiff suffered from a "[n]oncardiac source of chest pain."  Tr. 187.

By November 2004, Dr. Scott A. Klosterman, plaintiff's family physician, had diagnosed plaintiff as having Type II diabetes, coronary artery disease, hypertension, hypercholeserolemia, and paresthesias.  Tr. 240.  On February 14, 2005, plaintiff reported tingling in his left arm and chest discomfort to Dr. Klosterman.  Tr. 235.  Dr. Klosterman determined plaintiff's heart rate as having a regular rate and rhythm, and his lungs were clear.  Tr. 235.  Dr. Klosterman diagnosed plaintiff as having ulnar neuropathy, chest pain, and a history of coronary artery disease.  Tr. 235.  Dr. Klosterman prescribed Xanax for plaintiff's panic symptoms.  Tr. 235.

In April 2005, plaintiff presented to Dr. Klosterman, complaining of double-vision and headaches, but noting no neurological defects, except for weakness in his legs when he walks and "exertional claudication type of pain."  Tr. 233.  On another visit with Dr. Klosterman during the same month, plaintiff stated that he suffered from left leg pain, in both the calf and thigh.  Tr. 232.  Physical examinations on both occasions revealed no abnormalities, and Dr. Klosterman diagnosed plaintiff as having left leg claudication symptoms, onychomycosis (of the left toes), double-vision, and hypertension.  Tr. 232-33.

In July 2005, plaintiff began to complain of falling over when he walked.  Tr. 245.  On July 19, 2005, plaintiff reported that he was having problems with both legs when walking short distances.  Tr. 329.  Studies performed on his lower extremities produced the following results: ulcerative 50% stenosis of the distal left common iliac; less than

50% stenosis of the proximal right common iliac, and excellent bilateral lower extremity runoff. Tr. 328. The study reflects that "the bilateral common, deep and superficial femoral arteries and trifurcation vessels are unremarkable." Tr. 328. In August 2005, Dr. Richard J. Harp recommended that plaintiff start taking aspirin and Plavix, as well as an exercise program. Tr. 322-23. On August 7, 2006, Dr. Kooistra, Spartanburg Regional Heathcare System (SRHS), examined plaintiff and said the exam revealed "fluctuating findings." Tr. 368. Dr. Kooistra diagnosed plaintiff as having polyneuropathy, but not multiple sclerosis (MS). Tr. 368.

On December 29, 2006, plaintiff's family physician, Dr. Klosterman, asked plaintiff to begin an exercise regimen, walking up to a mile or two each day to increase his exercise tolerance. Tr. 459. On October 1, 2007, plaintiff reported to Dr. Klosterman that he was able to walk several times per day while walking his wife's dog, but he was having some arm pain. Tr. 453. On October 23, 2007, plaintiff followed up with Dr. Klosterman, informing him that plaintiff had some weakness to his left leg and arm, and tingling all over. Tr. 453. Dr. Klosterman discussed plaintiff's case with plaintiff's former family physician, Dr. Ruffing, and came to the conclusion that plaintiff's weakness and tingling were due to "psychogenic or nonspecific" factors. Tr. 453. On January 28, 2008, Dr. Klosterman recommended that plaintiff be "considered strongly for disability" due to his "functional capacity being decreased by his COPD and claudication." Tr. 451. Dr. Klosterman said that on multiple occasions he addressed plaintiff's compliance with pain and anxiety medications, which are controlled substances. Tr. 451. Dr. Klosterman felt that there was "some manipulation with the

family situation for these medicines." Tr. 451. He also stated that "the family situation with [plaintiff's] wife is very important to assess as [plaintiff's] underlying anxiety disorder and history of strong psychotropic drugs does make him a number one codependent personality as well as someone that is potentially easily manipulated." Tr. 451. Dr. Klosterman believes plaintiff could handle his own finances, but is not certain about his ability to handle his controlled substances medications. Tr. 451.

Neurological treatment notes covering the period of November 14, 2005, to November 15, 2007, are included in the record. Tr. 387-450. In November 2005, plaintiff had MRIs of his thoracic spine, cervical spine, and lumbar spine. The results were as follows: T1-T2 and T2-T3 showed moderate left neural foraminal narrowing; T4-T5 and T6-T7 showed posterior element spurring but no canal or foraminal stenosis; T10-T11 showed spurring with mild bilateral neural foraminal narrowing; C3-C4 showed mild to moderate right neural foraminal narrowing; C4-C5 showed moderate right and severe left neural foraminal narrowing; C5-C6 showed spurring abutting the cord with moderate to severe right and severe left neural foraminal narrowing; C6-C7 showed spurring abutting the cord with severe bilateral neural foraminal narrowing; C7-T1 showed moderate to severe right and severe left neural foraminal narrowing; T12-L1 showed left pericentral herniation with deformity of the left side of the cord; L1-L2 showed small tear in the posterior fibers on the left with protrusion abutting the exiting left L1 root; and L4-L5 showed moderate canal narrowing with moderate right and mild to moderate left neural foraminal narrowing and far right component abutting right L4 root. Tr. 432-34.

On November 30, 2005, plaintiff underwent upper and lower extremity nerve

conduction studies at Carolina Neurology, which resulted in a finding of axonal sensory motor neuropathy. Tr. 419-20. On July 26, 2006, plaintiff reported "difficulties of an increasing nature with ambulation, bowel and bladder function and lower extremity cramping." Tr. 408. Dr. Kooistra, the treating physician, stated upon examination that she was "less than impressed with changes in tone, bulk, or strength." Tr. 408. On January 22, 2007, plaintiff told Jeane Woolever, P.T., at SRHS, that he was doing well using a standard wheelchair up until a few months prior, when his hands became weaker and painful. Tr. 402. Plaintiff reported that he walked short distances with a walker, but he fell on a daily basis. Tr. 402. Plaintiff stated that he was in his wheelchair 70% of each day. Tr. 402. He also stated that he needs help bathing, dressing, and eating because he "drops things and is at times unable to hold items in either hand." Tr. 402. In addition, plaintiff stated that he needs help propelling his wheelchair because of pain and weakness. Tr. 402. Plaintiff received a motorized scooter in April 2007. Tr. 399-400. Carolina Neurology once again conducted upper and lower extremity nerve conduction studies on November 15, 2007; the upper extremity study found mild to moderate left cubital tunnel, and the lower extremity study found non-specific changes in bilateral sensory nerves. Tr. 387-88.

In February 2007, plaintiff presented to UCMC with weakness in his right side and difficulty swallowing. Tr. 473. The treating physician diagnosed plaintiff with possible transient ischemic attack (TIA) and/or cerebrovascular accident. Tr. 479. Plaintiff improved during the course of several days, and he was using his right hand to eat; his weakness was rated as "very mild 4/5." Tr. 473. There were no signs of a stroke;

a CT, MRI, and an echocardiogram were negative.  Tr. 473.  On the same date he presented to UCMC, plaintiff was found to be "alert and oriented, laughing and talking with wife, [complains of slight] headache, respirations regular and easy, states right side still feels numb, speech clear."  Tr. 482.  UCMC staff also noted that plaintiff used a cane to walk.  Tr. 482.  Plaintiff presented to UCMC once again in March 2007 as a result of a syncopal episode.  Tr. 486.  During the treatment for this episode, staff noted that he ambulated independently, and all examination and laboratory tests were normal.  Tr. 487.

On January 6, 2008, plaintiff presented to UCMC with a possible TIA.  Tr. 497.  An MRI did not reveal any abnormalities, and a bronchoscopy was administered.  Tr. 497.  UCMC discharged plaintiff on January 8, 2008.  Tr. 497.  Plaintiff used a cane during this hospitalization.  Tr. 503.

UCMC performed a lumbar spine MRI on plaintiff on June 10, 2008, and the MRI showed degenerative changes in the lumbar spine.  Tr. 550.  Specifically, the results showed: most pronounced degeneration at T12-L1 and L4-L5; spinal stenosis found, particularly at L4-L5 created by the disc space narrowing; bulging disc; posterior facet joint hypertrophy; no focal disc herniation; and no evidence of nerve root compression.  Tr. 550.

Plaintiff had a follow-up visit with Carolina Neurology on July 10, 2008, for chronic pain syndrome attributed to diabetic polyneuropathy.  He had been prescribed Celebrex for hip and low back pain, but his glucoses were stable and he would "occasionally ambulate with a walker."  Tr. 557.

A mental health diagnostic impression conducted by the Spartanburg Area Mental

Health Center on April 9, 2004, reflected that plaintiff had visual and auditory hallucinations, in addition to smelling embalming fluid.[1] Tr. 226, 229. Plaintiff expressed that he felt nervousness, stress, and depression from taking care of his mentally ill wife, who referred him to mental health treatment. Tr. 226. On May 17, 2004, plaintiff reported that his mood had stabilized, and he returned to work for one day each weekend. Tr. 221. He also reported that he and his wife were active in the church. Tr. 221. On May 26, 2004, during a clinical visit, plaintiff wanted his wife to do most of the talking, and plaintiff and his wife stated that plaintiff was "about to have a nervous breakdown." Tr. 219. Plaintiff and his wife said that plaintiff was getting mad suddenly, jumped up at night while sleeping, and suffered from "hearing things" and "memory loss." Tr. 219. Plaintiff also reported emotional trauma from the loss of his daughter, when she was nineteen years old and awaiting an organ transplant. Tr. 219. Dr. Janis Browning, the mental health physician, had the following impressions: plaintiff suffered from a factitious disorder, a personality disorder, leg pain, and he wants disability. Dr. Browning assessed a Global Assessment of Functioning (GAF) score of 55.[2] Tr. 218. Dr. Browning prescribed Xanax, Haldol, and Amitriptyline. Tr. 218.

On July 8, 2004, plaintiff reported to Wendy Davis, LMSW, that he was working four days each week, for a total of thirty-two hours per week. Tr. 216. On January 27,

---

[1] At the age of 22 or 23, plaintiff experienced a traumatic event following the death of his father. During the viewing of his father's body, embalming fluid leaked out of his father's chest cavity, and this may have led to his belief that he smells embalming fluid at certain times. Tr. 209.

[2] In 2007, Dr. Browning assessed plaintiff with a GAF of 45. Tr. 381-83.

2005, Dr. Browning met with plaintiff and his wife; plaintiff's wife opened the clinical session by asking questions about plaintiff's disability. Tr. 209. Plaintiff's wife stated that plaintiff's family physician agreed that plaintiff could no longer work because of heart disease. Tr. 209. Plaintiff was apparently short of breath and had difficulty ascending a flight of stairs; he also continued to hear things and smell embalming fluid. Tr. 209. Dr. Browning had initially diagnosed plaintiff has having factitious and personality disorders; however, she stated that "after talking to him in detail, . . . these two [diagnoses] relate more to his wife who wants to present him as disabled so that he can get disability." Tr. 209. She stated that a more appropriate diagnosis is post-traumatic stress disorder (PTSD). Tr. 209.

On February 14, 2005, Dr. Browning completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" form. Tr. 189-91. In the form, Dr. Browning rated plaintiff's ability to do the following tasks as "Fair": relate to co-workers; use judgment; interact with supervisors; understand, remember and carry out detailed, but not complex, job instructions; and maintain personal appearance. Tr. 189-90. She rated plaintiff's ability to understand, remember and carry out simple job instructions as "Good." Tr. 190. Finally, she rated plaintiff's ability to do the following tasks as "Poor" or "None": follow work rules; deal with the public; deal with work stresses; function independently; maintain attention/concentration; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. Tr. 189-90. Dr. Browning also noted that plaintiff is "[l]ikely to decompensate quickly if under stress." Tr. 190.

During a psychiatric exam on August 3, 2006, plaintiff admitted that he thought about hanging himself because he was depressed about his medical, marital, and financial situations. Tr. 361, 366. Plaintiff said that he had experienced weakness in his legs for approximately two years, and that he had a heart attack in 1996 and two more in 2004. Tr. 361. Plaintiff requested a wheelchair; however, the hospital staff provided him with a cane and encouraged him to walk as much as possible. Tr. 361. Plaintiff was admitted for mental health treatment on August 3, 2006, and he was discharged on August 14, 2006. Tr. 360. While in treatment, plaintiff took Clavil, Haldol, lorazepam, and alprazolam. Tr. 361. The record shows that plaintiff's mood had improved by the date of discharge, and he was no longer having suicidal thoughts. Tr. 362.

At his hearing before the ALJ, plaintiff stated that he lived with his wife, who was mentally disabled. Tr. 564. He stated that while performing his last job, as a rest area custodian for Hawthorne Services in 2004, he cleaned the rest area, did yard work, and emptied trash cans weighing between five and thirty-five pounds. Tr. 566-67. He testified that he could no longer work in July 2004 because he was unable to walk long distances. Tr. 567. He also stated that he suffered two heart attacks in 2004. Tr. 567-68. Plaintiff testified that he had TIAs in 2007 (Tr. 569), and that he stopped working and driving because he was "coming up with MS." Tr. 573, 576. Plaintiff stated that he has used a wheelchair for approximately two years because he is unable to walk due to numbness in his legs. Tr. 578. He stated that he continues to suffer from diabetes and uses oxygen for MS, COPD, and emphysema. Tr. 580. He testified that he has difficulty with his nerves to the extent that he wants to kill himself at times. Tr. 582. Plaintiff

showed the ALJ two missing fingers on his right hand and described how he is unable to pick up or pull much weight with that hand. Tr. 584-85. He testified that he spent most of each day watching television, and he sometimes paints small items like wind chimes for his wife. Tr. 586.

The ALJ stated during the hearing that plaintiff's family physician, Dr. Klosterman, never reported that plaintiff came into his office in a wheelchair, and in December 2006, Dr. Klosterman recommended that plaintiff start to walk one or two miles per day. Tr. 589. The ALJ asked why plaintiff claimed to need a wheelchair in late 2006/early 2007, yet his family physician wanted him to walk on a daily basis. Tr. 590. Plaintiff admitted that he could "walk a piece," but that Dr. Klosterman wanted him to walk "a long ways." Tr. 590. The ALJ told plaintiff, "just three weeks after you saw Dr. Klosterman you reported that you'd been unable for several months to even operate a regular wheelchair because you were so weak. . . And now you're saying here that you've been limited to being in a wheelchair for two years," the beginning of which would have been in late 2005. Tr. 590. Plaintiff responded, "Right." Tr. 590. The ALJ also questioned plaintiff regarding a report made by Dr. Klosterman in October 2007. Tr. 594. In the report, Dr. Klosterman wrote that plaintiff walked his wife's dog several miles per day. Plaintiff denied making such a statement and said, "I don't know where he got that from." Tr. 594. Plaintiff's attorney elicited testimony from plaintiff indicating that Dr. Kooistra originally prescribed the regular wheelchair approximately two years earlier, and then a motorized scooter approximately one year ago. Tr. 591-92.

Dr. Benson Hecker, a vocational expert, testified at the hearing. The ALJ asked

14

Dr. Hecker if, in his opinion, plaintiff could perform any of his past work based on the following hypothetical conditions:  plaintiff is limited to performing simple tasks without ongoing interaction with the public; he can lift fifty pounds occasionally and twenty-five pounds frequently; he can sit, stand and walk six hours each eight-hour day; and he needs to avoid working in dangerous environments.  Tr. 592-93.  Dr. Hecker testified that plaintiff could perform his past unskilled, medium work as a rest area cleaner.  Tr. 592-93.  The ALJ then presented Dr. Hecker with the a second hypthetical, adding the information contained in Dr. Browing's mental health assessment to the physical limitations above.  Dr. Browing's mental health assessment stated that plaintiff has poor or no ability to: follow work rules; deal with the public; deal with work stresses; function independently; maintain concentration; demonstrate reliability, and behave in an emotionally stable manner.  Tr. 593.  Dr. Hecker testified that there is no work plaintiff could perform under these circumstances.  Tr. 593.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140 (1985).  This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected.  See id. at 149-50.  A party's general objections are not sufficient to challenge a magistrate judge's findings.  Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir.

1991). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration. 28 U.S.C. § 636 (b)(1).

Although this court may review the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

16

# III. DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520, 416.920. Under this process, the ALJ must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether that severe impairment meets or equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without considering vocational factors; (4) if not, whether the impairment prevents him or her from performing past relevant work; and (5) if so, whether the claimant is able to perform other work considering both his remaining physical and mental capacities (defined as Residual Functional Capacity or "RFC") and his vocational capabilities (age, education, and past work experience) to adjust to a new job. Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). The applicant bears the burden of production and proof during the first four steps of the inquiry. Pass, 65 F.3d at 1203 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). If the sequential evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant could perform. Id.; see also Bowen v. Yuckert, 482 U.S. 137,

17

146 n.5 (1987) (discussing burden of proof).

In the case before the court, the ALJ found that plaintiff suffers several severe impairments (mild axonal neuropathy, diabetes mellitus, and possible anxiety); however, he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 16-19. The ALJ determined that plaintiff has the residual functional capacity to perform his past unskilled, medium work as a rest area cleaner. Tr. 25-26. Therefore, the ALJ held that plaintiff is not entitled to DIB or SSI benefits. Tr. 26.

## A. Treating Physician's Opinion

Plaintiff objects to the ALJ not giving "great weight" to the opinions of treating physicians, Drs. Klosterman and Browning. Plaintiff further asserts that both doctors concluded that he is "totally disabled." Pl.'s Objections 1-2.

Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527 (2005)). Opinions of treating physicians occupy a special status. "[T]he treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam); see also Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987) ("[The treating physician] rule requires that the opinion of a claimant's treating physician

18

be given great weight and may be disregarded only if there is persuasive contradictory evidence."); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.1983) (same). "A treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing 20 C.F.R. § 416.927). "Thus, '[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'" Id. (citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)). "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Id. (citing Hunter, 993 F.2d at 35).

Social Security Ruling 96-2p deals with giving controlling weight to treating source medical opinions and provides,

> 1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
> 2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
> 3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.
> 4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
> 5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The ruling goes on to explain that,

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision:

* is not fully favorable, e.g., is a denial; or
* is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

*the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. . . .*

(emphasis added).

The ALJ held that the opinions of Drs. Klosterman and Browning should be afforded some weight, but not controlling, or "great weight," because their opinions were not supported by clinical evidence, and their opinions were inconsistent with other substantial evidence. Tr. 21-24. The court agrees.

Dr. Klosterman treated plaintiff for a variety of ailments during the period of 2004-2008. This series of treatments culminated in a letter prepared by Dr. Klosterman on January 28, 2008. The letter states:

Larry has been a patient of mine since 2004 and a patient of my partner, Dr. Ruffing's, since 2000. Patient during that period of time has had significant

medical problems to include hospitalization three or four different times, mostly revolving around his breathing with chest pain dealing with significant problems as well as COPD exacerbations and lastly questionable stroke-like symptoms or TIAs. During that period of time, the patient has had a catheterization which was not medically indicating the need for stent or surgery; however, does affect his daily life. The patient as well has a history of claudication which we have worked up for leg pain. He also has a history of diabetes type 2 with neuropathy in his lower extremities. Contributing to this is also some anxiety disorder and osteoarthritis of the shoulders, knees and hips. We have also done a rheumatologic workup which was negative for these type of pains as well. The patient also at times depended on oxygen at home for low oxygen. This was related to the COPD, emphysema and infection. He does not have to be on oxygen chronically. As such, with so many medical problems and difficulty with mental anxieties and stresses from a typical workday, I am recommending that the patient be considered strongly for disability not only due to his pain but also his functional capacity being decreased by his COPD and claudication. The patient has had very good compliance with diabetes, hypertension and COPD medicines. He has had difficult compliance, though, with pain medicines and with anxiety medicines that are controlled substances. We have addressed this at multiple times with the patient and I do feel there is some manipulation within the family situation for these medicines; however, I overall feel that the patient does qualify. As such, I do feel that the family situation with his wife is very important to assess as Larry's underlying anxiety disorder and history of strong psychotropic drugs does make him a number one codependent personality as well as someone that is potentially easily manipulated. As such, though, I do feel that he can handle his own finances, while I am not sure medicine-wise for controlled substances. As such, I would be willing to discuss any concerns or questions regarding Larry's overall health and functional capacity.

Tr. 451. This letter generally describes plaintiff's overall health and condition; however, it does not address the specific degree to which plaintiff's ailments affect him. As the magistrate judge observed, "[Dr. Klosterman] did not describe any work-related limitations resulting from the diagnosed ailments." Report at 12. The letter also contradicts and omits information from some of Dr. Klosterman's earlier reports: (1) in November 2004, Dr. Klosterman diagnosed plaintiff with history of coronary artery

disease (Tr. 235); (2) in December 2006, Dr. Klosterman recommended that plaintiff walk one-to-two miles per day (Tr. 459); (3) in October 2007, Dr. Klosterman noted that plaintiff walked his wife's dog several miles per day; and (4) in October 2007, Dr. Klosterman concluded that plaintiff's "tingling" sensation and left-side weakness were due to "psychogenic or nonspecific" factors (Tr. 453).

The record reflects that Dr. Klosterman's final assessment is inconsistent with other substantial evidence. A variety of tests performed during the time period of 2004-2008, including an echocardiogram, stress test, EKG, left heart catheterization, chest x-rays, artery studies, CTs, and MRIs showed no abnormal results. Tr. 173, 195, 187, 328, 473, 497, 550. In addition, two state agency physicians completed physical residual functional capacity (RFC) evaluations indicating that plaintiff is not significantly limited in his ability to perform past relevant work. Dr. George Chandler concluded that plaintiff could: lift fifty pounds occasionally; lift twenty-five pounds frequently; stand and/or walk for approximately six hours in each eight-hour workday; sit for approximately six hours in each eight-hour workday; push and/or pull an unlimited amount; and he should avoid exposure to hazards. Tr. 351, 354. Dr. Chandler noted that plaintiff's medical records do not reflect the occurrence of heart attacks, but instead indicate "non-cardiac chest pain." Tr. 352; See Tr. 187. Dr. William Crosby, III, made identical findings regarding plaintiff's physical RFC. Tr. 343-47. Dr. Crosby also opined that plaintiff must never climb ladders, ropes, or scaffolds, and he may occasionally climb ramps and stairs. Tr. 344. In addition to the opinions above, the vocational expert, Dr. Hecker, testified that based on the RFCs above, plaintiff could perform his past work as a rest area

cleaner.  Tr. 593.

Dr. Browning's "Medical Assessment of Ability to Do Work-Related Activities (Mental)" report concluded that plaintiff is unable to follow work rules, deal with the public, deal with work stresses, function independently, maintain concentration, remember and carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  Tr. 189-90. Therefore, plaintiff argues he should be considered totally mentally disabled.  Pl.'s Objections 1.

As discussed in plaintiff's history above, Dr. Browning, plaintiff's mental health physician, initially diagnosed plaintiff as having factitious and personality disorders.  Tr. 209.  However, after talking to him at length, she discovered that those disorders related more to his wife, who wanted to present plaintiff as disabled.  Tr. 209.  In fact, plaintiff's wife opened the clinical session by asking questions about plaintiff's disability.[3]  Tr. 209. Dr. Browning indicated that PTSD was a more appropriate diagnosis; however, she failed to describe why this diagnosis was more appropriate, nor did she specify how this diagnosis affected plaintiff.  Tr. 209.  It is clear from the medical record that plaintiff has experienced mental health issues, yet aside from an incident of hospitalization for suicidal ideation in August 2006, the medical evidence shows that plaintiff's mental health has remained relatively stable from 2004 to 2008.

---

[3]Plaintiff's wife's involvement in his treatment session was also noted during a May 26, 2004 visit with Dr. Browning.  During that visit, plaintiff wanted to his wife to do most of the talking.  Tr. 219.  On such occasions, it is difficult to determine whether it was the plaintiff or his wife providing symptom-related information to Dr. Browning.

In January 2005, state agency psychologist Dr. Renuka Harper performed a psychiatric review of the medical evidence. Dr. Harper determined that plaintiff experienced moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace; however, there was no finding of extended duration decompensation episodes. Tr. 307. Dr. Harper also made the following finding: "Credibility of the [claimant's] statements is highly questionable. MHC notes indicate [claimant] highly motivated to try [and] get disability." Tr. 309. Dr. Harper notes that plaintiff would not be precluded from performing "simple routine work activities." Tr. 309. Dr. Harper completed a mental RFC assessment on January 11, 2005. In the assessment she found that plaintiff was not significantly limited in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to

basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places. Tr. 315-16. Dr. Harper found that plaintiff was moderately limited in the ability to: understand and remember detailed instructions; carry out detailed instructions; interact appropriately with the public; and set realistic goals or make plans independently of others. Tr. 315-16.

On July 6, 2005, state agency psychologist Dr. D.C. Price, reviewed the medical evidence and completed a mental RFC assessment. Dr. Price made similar findings to that of Dr. Harper, with the exception that plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods, rather than being not significantly limited in that area. Tr. 311. Dr. Price reported that plaintiff "retains the capacity to travel to and from work using available transportation. There is no evidence of significant impairment in ability to adapt to workplace changes . . . While his symptoms are severe, they would not preclude him from carrying out basic work functions." Tr. 313.

The opinions of plaintiff's treating physicians, Drs. Klosterman and Browning, lack the support of clinical evidence. Various medical tests performed on plaintiff and the opinions of multiple state agency physicians and a vocational expert present substantial evidence inconsistent with the opinions of Drs. Klosterman and Browning. As a result, the ALJ properly gave some weight to the opinions of the treating physicians, but not the controlling, or "great weight," sought by plaintiff. It should also be noted that the ALJ,

considered all symptoms and the extent to which the claimaint's self-reported symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. [The ALJ also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

Tr. 22. The court now turns to plaintiff's assertion that Drs. Klosterman and Browning concluded that plaintiff was "totally disabled." Pl.'s Objections 1.

The Code of Federal Regulations draws a distinction between a physician's medical opinions and his legal conclusions. "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), ... and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as "statement[s] by a medical source that [the claimant is] 'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(e)(1). While the ALJ must give a treating physician's medical opinions special weight in certain circumstances, the ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value. See 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to . . . [a treating physician's legal conclusions]. . . ."). The ALJ is not free, however, simply to ignore a treating physician's legal conclusions, but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." Social Security Ruling 96-5p at *3.

In his January 2008 letter, Dr. Klosterman stated, "I overall feel that [plaintiff] does qualify" for disability benefits.  Tr. 451.  Plaintiff asserts that Dr. Browning determined plaintiff to be "totally disabled."  Pl.'s Objections 1.  While the mental health assessment performed by Dr. Browning does not patently state that plaintiff is "totally disabled," her results certainly indicate that plaintiff has poor or no abilities in most work-related functional categories.  Tr. 189-90.  However, even assuming that Dr. Browning determined plaintiff to be totally disabled, neither Dr. Klosterman, plaintiff, nor Dr. Browning are qualified to make such a determination under existing law.  Such a conclusion is a *legal conclusion*, which is properly made by the ALJ alone.  Upon review of the entire record and all relevant evidence, the ALJ determined that plaintiff is not disabled, and the ALJ found that plaintiff's treating physicians' legal opinions were not supported by the evidence.

### B.  Credibility Findings Supported by Substantial Evidence

The second objection raised by plaintiff is that substantial evidence does not support the ALJ's finding that plaintiff was not credible.  "Because [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  The ALJ discovered several inconsistencies in plaintiff's testimony during the administrative hearing.

First, plaintiff could not remember his age when he left school in the seventh grade.  Plaintiff testified that he was "[a]bout 15."  Tr. 565.  Next, plaintiff testified that he suffered from two heart attacks in 2004 (Tr. 567-68), but neither of these incidents are

documented in the record by physicians who actually treated him for the alleged heart attacks. Plaintiff's statement regarding the heart attacks is also contradictory to Dr. Eusebio's treatment of plaintiff in December 2004. During the treatment, Dr. Eusebio found no significant coronary artery disease and stated that plaintiff suffered from a "[n]oncardiac source of chest pain." Tr. 187. Plaintiff then testified that he stopped working and driving because he suffered from the onset of MS (Tr. 573, 576); however, medical records include Dr. Kooistra's August 2006 finding that plaintiff does not suffer from MS. Tr. 368.

Plaintiff told the ALJ that he has had to use a wheelchair for the past two years because he was unable to walk as a result of numbness in his legs. Yet, he was unable to explain why his treating physician, Dr. Klosterman, never reported that plaintiff came to his office in a wheelchair. Tr. 589. Plaintiff was also unable to explain why, if he were unable to walk in late December 2006, Dr. Klosterman recommended that he begin walking one-to-two miles on a daily basis. Plaintiff merely stated that he was able to "walk a piece," but not long distances. Tr. 590. The ALJ pointed out that if plaintiff had started using a wheelchair approximately two years earlier, such use would have begun in late 2005. Plaintiff admitted that the ALJ was correct (Tr. 590), which once again contradicted the exercise recommendation of Dr. Klosterman in late 2006. Plaintiff's statement regarding his need for a wheelchair also contradicted treatment reports showing that plaintiff used a cane to walk on at least three occasions in 2006, 2007, and 2008. Tr. 361, 482, 503.

Finally, plaintiff denied telling Dr. Klosterman that he walked his wife's dog

several miles per day as of October 2007. Tr. 594. This statement was reported by Dr. Klosterman during plaintiff's October 1, 2007 office visit. Tr. 453. The court finds that the ALJ's finding regarding plaintiff's credibility is supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the court **ADOPTS** the magistrate judge's report and recommendation and **AFFIRMS** the Commissioner's decision denying benefits.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 18, 2010**
**Charleston, South Carolina**